92 P.3d 1000

Violet Leong KAU; Helen Gau Ngee Leong Lam; Jeremy Mun Shan Lam, individually and as Trustee under Declaration and Agreement of Trust dated June 29, 1981, executed by Julie Lynn Lam as Settlor; Sherry Mei Lin Chun, individually and as Trustee under Declaration and Agreement of Trust dated June 29, 1981, executed by Gilbert Kwai Leong Chun as Settlor; Caroline Yee Ingersoll, individually and as Trustee under Declaration and Agreement of Trust dated May 8, 1981, executed by Richard King Ingersoll as Settlor; Jacqueline Yee Reber, individually and as Trustee under Declaration and Agreement of Trust dated May 8, 1981, executed by David James Reber as Settlor; Gwendolyn Yee Coolidge, individually and as Trustee Under Declaration and Agreement of Trust dated May 5, 1981, executed by Charles Johnson Coolidge as Settlor; and Eleanor L.O. Park, as Trustee under that certain Diane Joan Bishop Irrevocable Trust Agreement, dated October 2, 1991, that certain James Sung Nin Leong Irrevocable Trust Agreement, dated October 2, 1991, that certain Robert Sung Wah Leong Irrevocable Trust Agreement, dated October 2, 1991, and that certain David Sung Mun Leong Irrevocable Trust Agreement, dated October 2, 1991, Plaintiffs–Appellants,

v.

CITY AND COUNTY OF HONOLULU; Rodney E. Gardiner; Marilyn J. Gardiner; Henry A. Zuberano, Trustee; Ruth Ellen Onasch, Trustee; Patricia Ann Miller, Trustee; George W. Trendle; Corrine R. Trendle; Betsy Hammes; Linda E. Bolton; A. William Barlow, Trustee; Roberta Hale Barlow, Trustee; George E. Cramp, Trustee; Eleanor D. Cramp, Trustee; Landis V. Haugen; Jacinta L.L. Yu; Garrett Saikley; William Ganslen; and Madelyn Ganslen, Defendants–Appellees;

and

John Does 1–50, Jane Does 1–50, Doe Corporations 1–50, Doe Partnerships 1–50, and Doe Entities 1–50, Defendants.

No. 23674.

Intermediate Court of Appeals of Hawai'i.

Oct. 11, 2001.

Certiorari Granted Nov. 11, 2001.

Richard K. Ingersoll, Simon Klevansky, and Robert J. Faris, Honolulu, (of counsel, Gelber, Gelber, Ingersoll, Klevansky & Faris), on the briefs, for Plaintiffs–Appellants.

David A. Nakashima, Honolulu, (of counsel, Alston Hunt Floyd & Ing), on the briefs, for Defendants–Appellees.

Opinion of the Court by BURNS, C.J.

In this cross-action for declaratory judgments, Plaintiffs–Appellants (the Lessors) appeal from the August 9, 2000 final judgment of the First Circuit Court. More specifically, the Lessors challenge the orders entered by Circuit Court Judge Gail C. Nakatani: (1) the November 22, 1999 "Order Granting Defendant–Lessees' Motion for Partial Summary Judgment [Filed July 16, 1999]" filed by Defendants–Appellees (the Assignee–Lessees of the 13), and (2) the November 22, 1999 "Order Denying Plaintiff–Lessors' Motion for Summary Judgment Against All Defendants on Complaint [Filed July 21, 1999]."

In this opinion, we conclude that (a) the probability that the condominium property regime (CPR)[1] of the property will terminate upon the expiration of the master lease in 2014 does not bar the application of Revised Ordinances of Honolulu (ROH) Chapter 38 to the property prior to 2014 and (b) the present record is insufficient to support a summary declaratory judgment that condemnation of the lessors' leased fee interests in the property fulfills the public purpose of ROH Chapter 38, which is the facilitation of fee simple residential apartments, condominium or other.

## BACKGROUND

The real property relevant to this dispute is a 15,957 square foot parcel of land at 3003 Kalakaua Avenue, Honolulu, Hawai'i (the Land). Prior to 1958, Mrs. Chang Tai Leong (Mrs. Leong) owned and lived in a residence on the Land. The Lessors are Mrs. Leong's

---

1. "Horizontal property regime" (HPR) under Revised Laws of Hawai'i Chapter 170A and "condominium property regime" (CPR) under Hawai'i Revised Statutes (HRS) Chapter 514A are synonymous.

descendants (or trustees of trusts established for the benefit of her descendants).

In 1958, Mrs. Leong's family executed a lease of the Land (Master Lease) to Kapiolani Park Land Company, Ltd. (the Original Lessee). The term of the Master Lease was fifty-five years from April 1, 1959, to midnight on March 31, 2014.

The Original Lessee constructed a building on the Land and organized it as a cooperative apartment project.[2]

Section 7 of Act 9, Haw. Sess. Laws 1962, states, in relevant part, as follows:

> **Horizontal property regimes.** Whenever a developer, a sole owner or the co-owners of a building expressly declare, through the recordation of a master deed or lease together with a declaration, ... their desire to submit their property to the regime established by this chapter, there shall thereby be established a horizontal property regime.

Section 3 of Act 101, Haw. Sess. Laws 1963, states, in relevant part, as follows:

> **Horizontal property regimes.** Whenever the sole owner or sole lessee or all of the owners or all of the lessees of a property expressly declare, through the execution and recordation of a master deed or lease, together with a declaration, ... his or their desire to submit the property to the regime established by this chapter, there shall thereby be established a horizontal property regime with respect to the property, and this chapter shall be applicable to the property.

**2.** The Master Lease also states:

> 2. *Term.* ... If upon the expiration of the term hereof the Lessors shall decide to sublease the demised premises to any other person, firm or corporation, the Lessee shall have the first right of refusal for a period of thirty (30) days after the receipt of written notice of said proposed sublease setting forth all the terms and conditions thereof, to take a further sublease of the demised premises upon terms no less favorable to the Lessee than the terms upon which the premises shall be offered to such other person, firm or corporation.
> ....
> 16. *Surrender.* At the end of said term or sooner determination of this lease, the Lessee

In other words, in 1964, a holder of a lease of land could establish a horizontal property regime (HPR) with only the lease and only for the life of the lease.

In 1964, the Original Lessee requested an amendment to the Master Lease to facilitate the Original Lessee's submission of its leasehold interest to a CPR.[3] Consent was given and an Amendment of Lease (Amendment) was executed on July 6, 1964, and states, in relevant part, as follows:

> WHEREAS, the Lessors and the Lessee desire to submit the land described in said Lease and the apartment building constructed upon said land to the horizontal property regime established by Act 180, Session Laws of Hawaii 1961, as amended, so as to convert said property into a condominium apartment project, ...
>
> ....
>
> NOW, THEREFORE, IT IS MUTUALLY AGREED by and between the Lessors and the Lessee that said Lease ... be and the same is hereby amended as follows:
> (a) by adding the following paragraph ...:
> 5. *Horizontal Property Regime.* The demised premises are hereby submitted to the horizontal property regime established by Act 180, Session Laws of Hawaii 1961, as amended, and shall during the whole of said term unless and until waived or otherwise terminated as provided by law, constitute and be established as a horizontal property regime known as 3003 KALAKAUA, consisting of a leasehold interest in the demised land, the building thereon, and the com-

will peaceably deliver up to the Lessors possession of the land hereby demised, together with all buildings and other improvements thereon, by whomsoever made, in good repair, order and condition, ...; provided, however, that if the Lessee shall not then be in default hereunder, it may thereupon remove from the demised premises any trade fixtures installed by it during said term upon condition that the Lessee shall at its own expense repair promptly to the satisfaction of the Lessors all damage caused by such removal.

**3.** The "horizontal property regime" for 3003 Kalakaua Avenue (the Property) was created pursuant to Revised Laws of Hawai'i § 170A-3 (1955), the pre-cursor to HRS Chapter 514A (1993).

mon elements thereof as described in the document entitled "Declaration of Horizontal Property Regime", attached hereto and made a part hereof.

(Emphasis in original.) This document initially states that "the land described in said Lease and the apartment building constructed upon said land" would be submitted to a HPR. However, it subsequently states that only "[t]he demised premises are hereby submitted to the horizontal property regime . . ., and shall during the whole of said term . . ., constitute and be established as a horizontal property regime known as 3003 KALAKAUA, consisting of a leasehold interest in the demised land, the building thereon, and the common elements thereof[.]" (Emphasis in original.)

Similarly, the Declaration of Horizontal Property Regime submits only the leasehold interest to the HPR as follows:

NOW, THEREFORE, said Lessee does hereby express its desire that its leasehold interest in said land and said building thereon shall be submitted to the Horizontal Property Regime established by Act 180 Session Laws of Hawaii 1961, as amended, and does hereby establish a Horizontal Property Regime with respect to its leasehold interest in said land and said building thereon.

. . . .

2. The building erected on said land is a 13–story reinforced concrete building occupying approximately 5,021 square feet of ground space and consisting of one basement garage floor, one apartment and lobby floor containing a lobby, a 2–bedroom 2–bath apartment and a 3–bedroom 2–bath apartment and eleven typical apartment floors each containing two 3–bedroom 2–bath apartments on each floor each apartment also containing a living room with a dining area, a dressing room and a kitchen with laundry area. There are forty-one (41) parking spaces in the Project.

. . . .

4. The apartment deed conveying an individual apartment will include an undivided interest as tenant in common with the owners of the other apartments in said building in and to the common elements of the building which in the case of apartment 1A will be a 3/95 interest and in the case of all other apartments a 4/95 interest.

The Assignee–Lessees of the 13 state that [f]ollowing the creation of the CPR, the Developer sold each of the condominium units which comprise the building constructed at 3003 Kalakaua, together with an assignment of a 1/25 leasehold interest in 3003 Kalakaua under the Master Lease to various individuals. Lessees own 13 of the 25 condominium units located at 3003 Kalakaua and are the assignees of 13/25 of the Developer's leasehold interest under the Master Lease.

(Footnote and record citations omitted.)

The Assignee–Lessees of the 13 state that there are "25 condominium units." According to our calculations, there are 24 residential condominium units (2 apartments on each of 12 floors = 24 apartments and $23 \times 4/95 + 3/95 = 95/95$). The Assignee–Lessees of the 13 own 13 of the 24 residential condominium units. The remaining 11 residential condominium units are owned by others. We will refer to the Land and the apartment building on it as "the Property."

Hawai'i Revised Statutes (HRS) § 514A–20 (1993) essentially became law via Section 9 of Act 132, Haw. Sess. Laws 1975, effective May 24, 1975, which states, in relevant part, as follows:

**Horizontal property regimes.** Whenever the sole owner or all of the owners including all of the lessees of a property expressly declare, through the execution and recordation of a master deed, together with a declaration, . . . his or their desire to submit the property to the regime established by this chapter, there shall thereby be established a horizontal property regime with respect to the property, and this chapter shall be applicable to the property.

In other words, commencing in 1975, an HPR could not be established for a parcel of land absent submission of the fee of the land to the HPR.

The statute originally referred to condominiums as "horizontal property regimes." In 1988, the statute was amended to change the language to "condominium property re-

gimes." 1988 Haw. Sess. Laws Act 65 §§ 1, 2; HRS § 514A–20 (1993).

In 1990, the City Council of Honolulu (City Council) introduced Bill No. 156 to address the effects of the leasehold system of land-ownership on Oahu's economy. In 1991, the City Council passed Bill No. 156 as Ordinance 91–95. Ordinance 91–95 became codified as ROH Chapter 38.[4] ROH Chapter 38 enabled lessees (and assignee-lessees) "to

4. Relevant sections of the Revised Ordinances of Honolulu, Chapter 38, state, in relevant part, as follows:

**Sec. 38–1.1 Purpose.**

The purpose of this chapter is to establish the right of any person, who is a lessee under any long-term lease of land upon which is situated either residential [CPR] projects created under HRS Chapter 514A, cooperative housing unit projects or residential planned development projects, to purchase at a fair and reasonable price the fee simple title to such land.

**Sec. 38–1.2 Definitions.**

. . . .

"Fee owner" means the person who owns the fee simple title to the land leased under an apartment lease, condominium conveyance document, or proprietary lease, including a life tenant with a remainder over, vested or contingent, and a holder of a defeasible estate, and the person's heirs, successors, legal representatives, and assigns.

. . . .

"Leased fee" and "leased fee interest" mean reversionary interests of the fee owner, lessor, and all legal and equitable owners of land which is leased, other than the lessee's or sublessee's interest.

"Legal and equitable owners" means the fee simple owner and all persons having legal or equitable ownership interests in the leased fee or in the lessor's leasehold estate, including mortgagees, developers, lienors, and sublessors, and their respective heirs, successors, legal representatives, and assigns.

. . . .

**Sec. 38–1.4 No estoppel or waiver.**

The rights granted to lessees by this chapter shall be effective, notwithstanding any provision in any lease, contract, covenant, bylaw, or articles of incorporation to the contrary. No lessee shall be estopped by any covenant, term, condition, or contract, however worded, from claiming the rights granted by this chapter, or otherwise be deemed to have waived those rights. Any provision in any lease, covenant, contract, bylaw or article of incorporation contrary to the intent or purpose of this chapter shall be void.

. . . .

**Sec. 38–2.2 Designation of development for acquisition.**

(a) Subject to subsection (b) of this section, the department may designate all or that portion of a development containing residential condominium land for acquisition, and facilitate the acquisition of the applicable leased fee interests in that land by the City through the exercise of the power of eminent domain or by purchase under the threat of eminent domain, after:

(1) At least ... owners of 50 percent of the condominium units, ..., apply to the department to purchase the leased fee interest. . . .

(2) Due notice is given and a public hearing held, ... the department finds that the acquisition of the leased fee interest in the development or a portion thereof, through exercise of the power of eminent domain or by purchase under threat of eminent domain and the disposition thereof as provided in this part, will effectuate the public purposes of this chapter.

(b) This land designated and acquired by the City may consist of a portion of or the entirety of the land area submitted to the declaration of condominium property.

**Sec. 38–2.3 Purchase of leased fee interest.**

The condominium lessees who have authorized approval and who have qualified for purchase of the leased fee interest, shall purchase from the City within 60 days of acquisition of the interest by the City, the leased fee interest appertaining to their condominiums, together with an undivided leased fee interest equal to the percentage of common interest appurtenant to the lessees' condominium units, subject to the terms, covenants, and conditions of the contract executed with the City. If any lessee refuses to enter into such a contract, then in that event, such lessee shall pay to the City all costs incurred by the City in the acquisition of the appurtenant condominium leased fee interest within the development including but not limited to appraisal costs, costs of publication, and survey, and the department is authorized to take whatever action it deems necessary to collect the costs; ...

**Sec. 38–2.4 Qualification for purchase.**

(a) No sale of any condominium land within a development shall be made unless the lessees:

(1) Are ... owner-occupants of their condominium units;

. . . .

(4) Do not own property in fee simple lands suitable for residential purposes within the City and County of Honolulu. . . .

. . . .

(7) Execute a contract for the purchase of the fee interest in such form as is acceptable to the department [City department of housing and community development].

. . . .

**Sec. 38–5.3 Compensation.**

The compensation to be paid for the leased fee interest shall be the current fair market value of the leased fee interest. The compen-

purchase the leased fee interest in their condominiums[.]"[5] ROH § 38–2.5(a). The "leased fee interest" (Leased Fee Interest) is the "reversionary interests of the fee owner, lessor, and all legal and equitable owners of land which is leased, other than the lessee's or sublessee's interests." ROH § 38–1.2. The public purpose of ROH Chapter 38 was affirmed in *Richardson v. City and County of Honolulu*, 124 F.3d 1150 (9th Cir.1997). The Ninth Circuit stated that the purpose of Chapter 38 was to "[remedy] a failure in the real estate market and [strengthen] the economy." *Id.* at 1158.

In 1994, the Assignee–Lessees of the 13 began the ROH Chapter 38 process to purchase the Leased Fee Interest. The Lessors vigorously objected to the process at every step and, as a result, the City and County of Honolulu (the City) did not move forward with the condemnation action. At the suggestion of the City's Corporation Counsel, the Lessors and the Assignee–Lessees of the 13 agreed to apply to the circuit court for expedited relief.[6]

On June 15, 1999, the Lessors filed a Complaint for Declaratory Relief[7] against the

---

sation shall be determined as of the date of the summons of the complaint in eminent domain.
**Sec. 38–5.4 Interest acquired.**
(a) Upon acquisition of a development or portion thereof as provided in this article, the property interest acquired by the city is all of the right, title, and interest of the fee owner, and of the lessor and fee owner and all legal and equitable owners, if any besides the lessor, in and to the development or portion thereof acquired, subject to all covenants, conditions, easements, reservations, and restrictions of record running with the land or contained in the agreement of sale, deed, or other conveyance held by the fee owner, lessor, and legal and equitable owners or permitted or suffered by lessees of existing residential condominium or cooperative housing corporation leases, which are not inconsistent with the intent of this article. The acquisition terminates all the right, title, and interest of the fee owner, lessor, and all legal and equitable owners, whether such interest be a remainder, vested or contingent, a reversion, or other beneficial interest in the property, present or prospective.
. . . .
**Sec. 38–6.1 Fee simple condominium and cooperative and planned unit development revolving fund.**
A fee simple condominium and cooperative and planned unit development revolving fund is created. The funds appropriated for the purposes of this chapter and all moneys received or collected by the department of housing and community development under this chapter shall be deposited in the revolving fund. The proceeds in the fund shall be used for the necessary expenses of the department, including administration, under this chapter. All interest earned on moneys deposited by lessees into this revolving fund shall accrue to the lessees.

5. In their opening brief, the Lessors assert that out of the 43,572 leasehold condominium units on Oahu in 1992, only the lease was submitted to the CPR in only thirteen projects, containing a total of only 830 units. They also assert that "[i]n the case of ten more projects, containing

854 units, the fee simple interest was submitted to the CPR but only for the term of the lease."

6. In their opening brief, the Lessors stated, "The Fee Owners objected that the Ordinance cannot be applied to the Property because the Fee Owners have never submitted the fee title to a CPR and the Lessees-Applicants would not obtain fee simple condominiums but would instead become, at best, co-investors."

In an accompanying footnote, the Lessors stated, "By agreement, the Fee Owners reserved all other objections for later determination if necessary."

7. HRS § 632–1 (1993) reads, in relevant part, as follows:

**Jurisdiction; controversies subject to** . . . .

. . . .
Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
HRS § 632–6 (1993) reads as follows:
**Provisions, remedial.** This chapter is declared to be remedial. Its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor. It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.

Assignee–Lessees of the 13 and the City asking the Court to

(a) enter a declaratory judgment determining that, when the Master Lease terminates, (i) the ... [CPR] created by the Declaration will terminate, and (ii) none of the [Assignee–Lessees] will own fee simple condominium units even if they are permitted to acquire fee simple interests in the Subject Property under the Ordinance, and (b) grant to the [Lessors] all other and further relief to which they may be entitled or which may be appropriate in the circumstances.

On June 24, 1999, the Assignee–Lessees of the 13 answered the complaint and filed a counterclaim against the Lessors praying

for a declaratory judgment in favor of [the Assignee–Lessees of the 13] and against [the Lessors] that:

(1) the public purpose of [ROH] Ch. 38 is fulfilled by condemnation of [the Lessors'] leased fee interests at 3003 Kalakaua;

(2) [ROH] Ch. 38 applies to the Subject Property and [the Assignee–Lessees of the 13], regardless of whether the horizontal property regime established with respect to the Subject Property terminates at the expiration of the Master Lease or whether [the Assignee–Lessees of the 13] will acquire a fee simple condominium as a result of the condemnation process;

(3) [The Assignee–Lessees of the 13] will acquire a fee interest in the land appurtenant to their condominium units as a result of the condemnation process; and

(4) For such further relief as this Court may deem just and equitable.

On July 8, 1999, the City answered and prayed as follows: [8]

1. That this Court enter a declaratory judgment determining that said Chapter 38, ROH, applies to the subject property and the City has properly proceeded with the implementation of the provisions of

said Chapter 38 with respect to the subject property.

2. That this Court enter a declaratory judgment determining that when the Master Lease expires, the [HPR] or [CPR] will not terminate, and [the Assignee–Lessees of the 13] will own fee simple condominium units.

Soon thereafter, the Assignee–Lessees of the 13 filed a motion for summary declaratory judgment (motion for SDJ) and the Lessors did the same.

The Lessors' motion for SDJ sought a declaration that: (1) the CPR will terminate upon the expiration of the Master Lease in 2014 and (2) thereafter, none of the Assignee–Lessees of the 13 will own fee simple condominium units even if they are permitted to acquire fee simple interests in the Property through the condemnation process under ROH Chapter 38. In the view of the Lessors, these two declarations would compel the conclusion that application of the Ordinance in this case cannot serve the fundamental purpose of the Ordinance and, therefore, preclude application of the Ordinance.

By way of an April 14, 1999 letter from attorney D. Scott MacKinnon, the Lessors pointed out that

[w]hen the Master Lease terminates ..., the legal subdivision of the air space in the 3003 Kalakaua apartment building into legally separate and identifiable condominium apartment units under the Hawaii Condominium Act will also terminate.... What will remain ... is the land with an apartment building situated on it with no legally separate and independent condominium apartment units. In a condominium created and established at the fee simple level this does not occur. When the subdivision of the air spaces within a building submitted to a [CPR] is created at the fee level, the termination of any Master Lease and/or individual apartment leases of those condominium apartment units does not terminate the underlying subdivision of the building into separate, legally

---

8. Although the answer filed in the circuit court by the Defendant–Appellee City and County of Honolulu (the City) supported the position of the

Defendants–Appellees, the City in this appeal filed a "Statement of No Position."

subdivided and identifiable condominium apartment units as set forth in and effected by the declaration of [CPR].

... The City's Fee Conversion Ordinance is intended to apply to a [CPR] established at the fee simple level. In such a condominium the fee owners own all of the individual condominium apartments and the undivided interest in the common elements of the project, including the land, appurtenant to each such condominium apartment in fee simple, subject to the apartment leases issued to the individual apartment purchasers/lessees. Thus, in the event of a condemnation under the City's Fee Conversion Ordinance it is the fee simple interest owned by the fee owners in *each* of the individual condominium apartments subject to the apartment lease demising each such condominium apartment, which is condemned....

In the case of a [CPR] established only at the leasehold level, ... [w]hen the Master Lease terminates the [CPR] also terminates. At that time, the whole of the land and the building improvements situated on the land will be owned individually and collectively by *all* of the persons then holding the fee simple interest in the property. There are no legally separate and identifiable condominium apartment units to which any "fee owner" would have an exclusive right to use....

The City's Fee Conversion Ordinance does not address this situation.... [T]he individual apartment owner/lessee who acquires an interest through such a condemnation will become ... the owner of an undivided fee interest in an apartment building, not the fee owner of an individual condominium apartment.

 ....

... [W]hen the Master Lease terminates, the [CPR] ceases to exist, and all parties owning an interest in the "fee" will become tenants in common holding an undivided interest in the Land and the building on the land[.] ... Generally, under the common law each co-tenant has a co-equal right to the use and possession of the commonly owned property, and no individual co-tenant has the unilateral right to exclude the other co-tenants from any particular portion of the property....

 ....

Generally, absent a written agreement, *all* of the co-tenants holding an interest in real property must agree for any major decision regarding the real property to be binding and effective, such as the sale of the real property, major repair or renovation of the property, a co-tenancy agreement among the co-tenants, or resubmission of the property to a [CPR].... In essence, each one of the co-tenants will possess a veto right as to any actions involving the real property....

 ....

... Each condominium apartment owner ... is not responsible if any of the other condominium apartment owners fails to pay his/her real property taxes. That is not the case with commonly owned property.... All co-tenants would be *jointly and severally liable* for the payment of the full amount of the real property taxes on the entirety of the land and improvements....

In addition, similar problems may exist for purposes of maintenance, repair and insurance for the property[.] ...

Finally, there would no longer exists [sic] a separate and legally identifiable condominium apartment unit for mortgage loan purposes for each of the co-tenants.

(Emphases in the original.)

A hearing on both motions for SDJ was held on August 26, 1999. On November 22, 1999, the circuit court issued two orders.

First, the court denied the Lessors' motion for SDJ and stated:

The court finds, as a matter of law, that declaratory relief is not appropriate because there is no actual controversy concerning the expiration of the CPR and the Master Lease in 2014. [The Lessors] [seek] only an advisory opinion insofar as it is speculative as to what may occur fifteen (15) years hence. [HRS] § 632–1.

Second, the court granted the motion for SDJ by the Assignee–Lessees of the 13 and stated:

[T]he court concludes that the condemnation of the [Lessors'] leased fee interests in [the Land] satisfies and fulfills the intended public purpose of [ROH] Chapter 38. That purpose is "strengthening O'ahu's economy and remedying the perceived failures in its real estate market." *Richardson v. City and County of Honolulu*, 124 F.3d 1150, 1158 (9th Cir.1997). This purpose is effectuated by the acquisition by [the Assignee-Lessees of the 13] of the "leased fee interest appertaining to their condominiums, *together* with an undivided leased fee interest equal to the percentage of the common interest appurtenant to the lessee's condominium units." [ROH] § 38–2.3. (Emphasis added).

Regardless of whether [the Lessors'] leased fee interests were submitted to the CPR, their interests are, nevertheless, subject to condemnation. In addition to satisfying the public purpose, [ROH] Ch. 38's broad application "to all lands ... on which are situated either residential [CPR] projects created under HRS Chapter 514A" also lends support to this interpretation. [ROH] § 38–1.3.

Because of the condemnation, the nature of [the Assignee-Lessees of the 13's] interest acquired through condemnation is that as provided for by the [ROH], not the CPR, Master Lease, or any other document. The interest [the Assignee-Lessees of the 13] will acquire is the "leased fee interest appertaining to their condominiums, together with an undivided leased fee interest equal to their percentage of common interest appurtenant to [the Assignee-Lessees of the 13's] condominium units." [ROH] § 38–2.3 As a corollary, the same interest is subject to condemnation.

On May 24, 2000, the Assignee-Lessees of the 13 filed a "Motion to Dismiss [Lessors'] Complaint and for Entry of Final Judgment or, in the Alternative, for Rule 54(b) Certification." On July 19, 2000, Circuit Court Judge Gary W.B. Chang entered an order granting the motion and stating "that all substantive issues raised in the Complaint and Counterclaim have been addressed, including but not limited to whether [the Assignee-Lessees of the 13] will acquire fee simple condominiums under the circumstances existing at [the Land]." On August 9, 2000, Judge Chang entered final judgment in favor of the Assignee-Lessees of the 13 and the City and against the Lessors.

## STANDARD OF REVIEW

 We review [a] circuit court's award of summary judgment de novo under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); see [HRCP] Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

> *Konno v. County of Hawaii*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). "The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina*, 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

> *Taylor v. Government Employees Ins. Co.*, 90 Hawai'i 302, 305, 978 P.2d 740, 743 (1999) (quoting *State Farm Mut. Auto.*

*Ins. Co. v. Murata,* 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997))) (brackets in original).

*Fujimoto v. Au,* 95 Hawai'i 116, 136–37, 19 P.3d 699, 719–20 (2001).

## QUESTIONS PRESENTED BY THE LESSOR AND ANSWERS

1. Was the circuit court right or wrong when it concluded that the Lessors' complaint for declaratory judgment sought an advisory opinion and dismissed the Lessors' complaint on that ground? It was right. The declarations sought by the Lessor pertain to what will be the situation in 2014 and such declarations cannot be made absent a speculative assumption that nothing will change between now and then.

2. Does the probability that the CPR of the Property will terminate upon the expiration of the Master Lease in 2014 bar the application of ROH Chapter 38 to the Property prior to 2014? The answer is no.

## DISCUSSION

■ When the Original Lessee commenced the CPR in 1965, the Original Lessee had and submitted only a leasehold interest in the Land. When the CPR was established, the CPR statute had not yet been modified to require that the fee interest be submitted to the CPR. Thus, only the Master Lease of the Land was submitted to the CPR and the life of the CPR was the life of the Master Lease. If the City acts pursuant to ROH Chapter 38 and acquires all or a part of the Leased Fee

Interest of the Land, the Master Lease and the CPR may expire in 2014.

The Lessors argue that

due to the unusual way in which this particular condominium was organized, *applying the Ordinance to the property would not give the Lessee/Applicants ownership of fee simple condominiums, would not increase the supply of fee simple condominium land on Oahu, and would not solve the economic problems caused by the leasehold system of condominium home ownership.*

(Emphasis in the original.)

The Assignee–Lessees of the 13 respond that

[t]he unambiguous language of the Ordinance does not require, as a condition precedent to its application, either: (1) that the leased fee interest in land on which a CPR project is located be submitted to the CPR, or (2) that the Lessees acquire a fee simple condominium as a result of the condemnation process.

The Assignee–Lessees of the 13 are right. When no less than fifty percent (50%) of the owners of the condominium units apply to the City department to purchase the leased fee interest, ROH § 38–2.2 authorizes the City to condemn "all or that portion of a development containing residential condominium land for acquisition, and facilitate the acquisition of the applicable leased fee interests in that land by the City through the exercise of the power of eminent domain[.]"

When the leased fee interests are acquired pursuant to ROH Chapter 38, the land must be residential condominium land. Nothing, however, requires it to remain so thereafter.[9]

---

9. HRS § 514A–21 (1993) states, in relevant part, as follows:

**Removal from provisions of this chapter.** (a) If:

(1) Apartment owners owning not less than eighty per cent . . . execute and record an instrument to the effect that they desire to remove the property from this chapter, and the holders of all liens . . . consent thereto . . ., or

. . . .

then, . . . the property shall be subject to an action for partition by any apartment owner or lienor as if owned in common, in which event the sale of the property shall be ordered by the

court and the net proceeds of sale, . . . shall be considered as one fund and shall be divided among all the apartment owners in proportion to their respective common interests, provided that no payment shall be made to an apartment owner until there has first been paid off out of the owner's share of such net proceeds all liens on the owner's apartment. . . .

(b) All of the apartment owners may remove a property, . . . from this chapter by an instrument to that effect, duly recorded, provided that the holders of all liens affecting any of the apartments consent thereto, by instruments duly recorded. Upon such removal from this chapter, the property, . . . ceases to be the subject of

That is why the probability that the CPR of the Property will terminate upon the expiration of the Master Lease in 2014 does not bar the application of ROH Chapter 38 to the Property prior to 2014.

■ The ultimate objective of ROH Chapter 38 is fee simple residential apartments, condominium or other. Thus, the City's authority to do what the Assignee–Lessees of the 13 want it to do requires reasonable assurance that its action will result in fee simple residential apartments, condominium or other.

## CONCLUSION

Accordingly, we affirm the circuit court's November 22, 1999 "Order Denying Plaintiff–Lessors' Motion for Summary Judgment Against All Defendants on Complaint [Filed July 21, 1999]."

We vacate the circuit court's (a) August 9, 2000 final judgment and (b) November 22, 1999 "Order Granting Defendant–Lessees' Motion for Partial Summary Judgment [Filed July 16, 1999]." We remand for entry of an order granting in part and denying in part "Defendant–Lessees' Motion for Partial Summary Judgment Filed July 16, 1999." The order shall conclude that (a) the probability that the CPR of the Property will terminate upon the expiration of the Master Lease in 2014 does not bar the application of ROH Chapter 38 to the Property prior to 2014 and (b) the present record is insufficient to support a summary declaratory judgment that condemnation of the Lessors' leased fee interests in the Property fulfills the public purpose of ROH Chapter 38.

a [CPR] or subject to this chapter, and is deemed to be owned in common by the apartment owners in proportion to their respective common interests.